THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RONNIE BULLOCK, Defendant-Appellant.

First District (2nd Division)   No. 84—2957

Opinion filed March 17, 1987.

James J. Doherty, Public Defender, of Chicago (Judith A. Stewart, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Mary Ellen Dienes, and Curtis A. James, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

After a jury trial, defendant-appellant Ronnie Bullock was found guilty of the deviate sexual assault and aggravated kidnaping of D.L., a nine-year-old female, and was sentenced to concurrent terms of 60 and 15 years for the respective offenses. On appeal, defendant presents five issues for review. Initially, defendant contends that evidence of "other crimes" (*i.e.*, a deviate sexual assault upon and aggravated kidnaping of C.N., a 12-year-old female) was inadmissible against him to establish *modus operandi* and identity. Secondly, defendant argues that it was improper for the trial court to allow C.N. to testify concerning the fact that she recognized Bullock in a lineup identification. Defendant next maintains that evidence of a composite sketch which was the product of the two victims' descriptions was inadmissible against him because the sketches were drawn in a suggestive manner. Furthermore, defendant asserts that he was prejudiced by the State's closing arguments in which the prosecutor repeatedly referred to the "two little girls." Finally, the defendant claims that information regarding another suspected rapist was improperly withheld from him in pretrial discovery. We affirm the judgment of the trial court.

D.L. testified that she was walking to school at approximately

8:15 a.m. on March 18, 1983, when she noticed a man in a "police uniform" standing by a beige-colored car in her friend's driveway. She looked at him, he looked at her, and she began to run. The man backed the car out of the driveway and chased the girl to the corner. D.L. heard two shots. The man then got out of the car, grabbed D.L., forced her into the front seat and ordered her to lie on her stomach, and proceeded to drive into an alley. While still in the front seat, he pulled down her panties and inserted his penis in her anus. D.L. subsequently fled after he told her to get out of the vehicle.

C.N. testified that on the morning of April 18, 1983, she was returning to school with her report card in an area approximately eight blocks from where D.L. was assaulted. She saw a man with blue pants, white shirt, a tie, jacket, and a blue car. The man was holding in his hand a black wallet which contained something resembling a police badge. He asked C.N. if she knew where the 51st Street police station was, and she responded that she did not know. He then asked her if she wanted a ride to school. When she said no and ran away, the man chased her, caught her, put a gun to her stomach, and forced C.N. into the front seat of the car. He told her to get down on her knees while he drove the car into an alley. While still in the front seat, he pulled down one leg of her slacks and inserted his penis in her vagina while she was lying on her stomach. He put tissue in her vagina and released her.

Detective Hickey, an officer assigned to investigate the D.L. and C.N. attacks, developed a theory that one man was the attacker of both girls and arranged for D.L. and C.N. to meet with Officer John Holmes, a police artist, in order to get a composite sketch of the assailant. Holmes worked with D.L. first and constructed a representation of her attacker, and C.N. viewed the picture and suggested that the artist add wrinkles to the forehead, which Holmes did. Both girls concurred that the resulting composite sketch looked like the man who had sexually assaulted each of them.

The composite sketch was circulated on a police department "Daily Bulletin" on April 30, 1983. On May 2, 1983, Officer Edward Moore contacted Detective Hickey and told her that he recognized the composite as Ronnie Bullock. On May 5, 1983, Bullock was arrested. On that same day, D.L. and C.N. each viewed separately a lineup in which both girls positively identified Bullock as the man who had attacked them.

Prior to trial on the charges involving D.L., Bullock filed a motion *in limine* to restrict the State's use of evidence involving the deviate sexual assault on C.N. The trial court ruled that the evidence of the

assault on C.N. was admissible in order to show *modus operandi* and identity. Bullock's primary complaint on appeal is that evidence of the crimes committed against C.N. was improperly admitted at the trial on the charges involving D.L.

■ In considering Bullock's contention, we recognize that the trial court is afforded some latitude in assessing relevance. A reviewing court should not reverse the trial court's finding on the admissibility of evidence unless an abuse of discretion occurs. (*People v. Lieberman* (1982), 107 Ill. App. 3d 949, 955, 438 N.E.2d 516.) Evidence of crime other than the one for which the accused is being tried is generally not admissible. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489, 492.) There is an important exception to this rule, however. Evidence of other crimes committed by a defendant may be admitted if relevant to establish any material fact other than the propensity of the defendant to commit a crime which includes, but is not limited to *modus operandi*, intent, identity, motive, and absence of mistake. *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.

According to *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292, a recent Illinois decision:

"*Modus operandi* means, literally, 'method of working.' It refers to a pattern of criminal behavior so distinct that separate crimes or wrongful conduct are recognized as the work of the same person. [Citation.] If evidence of other crimes is offered to prove *modus operandi*, there must be some clear connection between the other crime and the crime charged which creates a logical inference that if defendant committed one of the acts, he may have committed the other act. *** [T]he inference is created when both crimes share peculiar and distinctive common features so as to earmark both crimes as the handiwork of the defendant. *** While there must be a strong and persuasive showing of similarity between the other crime and the crime charged to satisfactorily demonstrate *modus operandi* [citation], it is not necessary that the crimes be identical for the other crime to be admitted into evidence ***." 138 Ill. App. 3d 481, 486-87, 485 N.E.2d 1292.

In sum, therefore, the courts must consider the circumstances and pattern of events in their entirety, on a case-by-case basis, in determining whether the *modus operandi* exception applies. *People v. Pavic* (1982), 104 Ill. App. 3d 436, 443, 432 N.E.2d 1074.

The assaults on D.L. and C.N. are not identical in all respects. One major difference, for example, is that the rape of D.L. was anal

intercourse whereas the rape of C.N. was vaginal intercourse. Also, different cars were used in the two attacks. Nevertheless, considering the circumstances and pattern of events in their entirety, it seems clear that the crimes against the two girls share peculiar and distinctive features so as to earmark both crimes as the handiwork of one man. The points of similarity were: (1) both victims were young girls who were abducted on a weekday as they walked to school; (2) the assailant in both cases represented himself as a police officer by displaying a badge or dressing in a police uniform; (3) the attacker got out of his car, chased both girls on foot, caught them, and forced them into the front seat of his car; (4) in both cases the assailant possessed a gun, though he used the weapon differently in each case; (5) both victims were driven to a nearby alley and, while still in the front seat of the car, were undressed from only the waist down, (6) both girls were then forced to lie on their stomach while the attacker sexually assaulted them from behind; (7) both attacks occurred eight blocks from each other and only 30 days apart. Moreover, Bullock was positively identified by both girls in separate lineups and at trial as the man who sexually attacked them.

The defendant argues that *modus operandi* evidence should not have been admitted because no single factor in the two attacks was unique or distinctive. We do not find this reasoning to be persuasive, however, and accept the logic of the California court which stated that "the inference [that if defendant committed one crime he may have committed the other need not depend upon one or more unique *** features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together." (*People v. Haston* (1968), 69 Cal. 2d 233, 245-46, 444 P.2d 91, 99; quoted in *People v. Butler* (1978), 63 Ill. App. 3d 132, 141, 379 N.E.2d 703.) In the instant case, we believe that the numerous similarities certainly form a distinctive combination when considered together.

Illinois case law amply supports this finding. For example, the parallels between *People v. Watson* (1981), 98 Ill. App. 3d 296, 424 N.E.2d 329, and the case *sub judice* are striking. In *Watson*, the similarities between the offense charged and the *modus operandi* offense were: (1) both victims were young black girls who were accosted by the defendant as he drove an automobile; (2) a gun was displayed; (3) the girls were forced into the car and driven to a building where the attack occurred; (3) the girls were forced to remove only their bottom clothing; (4) the attacks occurred only one month apart. Though the

court acknowledged that differences existed between the two attacks, such as the fact that different cars were used, different sexual acts were performed, and different guns were used, the court found that the similarities outweighed the dissimilarities and held that what is important is the similitude of the defendant's overall conduct in each instance, specifically rejecting the defendant's argument that the State had failed to show a unique factor common to the two attacks.

■ By comparison, although in the case at hand there were also different cars used and different sexual acts performed, the similarities between the charged offense and the *modus operandi* offense are more compelling than in the *Watson* case, with such distinctive features as rear entry intercourse and the masquerading as a policeman necessitating a finding that the *modus operandi* testimony was admissible. In any event, as mentioned earlier, the trial judge is given some latitude in ruling on the admissibility of evidence. We do not believe that he abused his discretion in this instance.

Defendant asserts that the trial court erred when it allowed C.N. to testify that she recognized Bullock as her assailant in a lineup identification, claiming that it would have been sufficient for her to testify about the attack and then simply identify the defendant as her attacker. In support of this contention, Bullock cites the cases of *People v. Butler* (1975), 31 Ill. App. 3d 78, 334 N.E.2d 448, and *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773. In *Connors*, for example, the court stated that "[t]he details of the other crime and the absence of connecting facts which would bring it within one of the exceptions to the other crime rules made its introduction error." *People v. Connors* (1980), 82 Ill. App. 3d 312, 319, 402 N.E.2d 773.

■ Bullock's argument can be summarily rejected, for both of the cases cited by defendant are distinguishable in light of the fact that in both instances no *modus operandi* was found; hence there is an absence of "connecting facts" which make the introduction of other-crimes evidence justifiable. In contrast, once C.N.'s testimony established Bullocks' *modus operandi*, her testimony regarding the lineup identification was admissible to prove the identity of D.L.'s attacker. In short, C.N.'s lineup identification was a necessary "connecting fact" linking her testimony to Bullock. In cases in which victim testimony determined that there was a distinct *modus operandi*, the lineup identification of the "other crimes" victim was admissible into evidence. *People v. Matthews* (1985), 137 Ill. App. 3d 870, 876.

The previously mentioned *Lieberman* case is instructive in this regard. The court stated therein that "[t]he State's eyewitness testimony and corroborating physical evidence was contradicted by

defendant's alibi defense; identity and *modus operandi* of the assailant was therefore in question and the State clearly had a need to present evidence probative and relevant to these issues." (*People v. Lieberman* (1982), 107 Ill. App. 3d 949, 438 N.E.2d 516.) Similarly, Bullock also presented an alibi defense, and, as in the *Lieberman* situation, the State had a need to present evidence probative of identity to counteract the defense. Therefore, we hold that C.N.'s lineup identification was admissible at trial.

The third issue the defendant raises on appeal is that it was improper for the trial court to allow into evidence the composite sketch because it was allegedly drawn in a suggestive manner. The Supreme Court of Illinois has stated that the admissibility of out-of-court identification may be challenged on the ground that the surrounding circumstances under which the identification was obtained were unnecessarily suggestive. (*People v. Rogers* (1980), 81 Ill. 2d 571, 575, 441 N.E.2d 223.) The State, however, argues that the court properly admitted the composite sketch where the evidence showed that the composite was not made in a suggestive manner and the victims "adopted" the composite as an accurate representation of their attacker.

Bullock contends that the composite should not have been admissible because it did not represent accurately either victim's attacker, but only a conglomerate picture of both girls' descriptions which, unfortunately, matched the description of Bullock. Suggestiveness, therefore, his argument continues, arose from the fact that each girl would inherently strive to produce a picture that they could agree on, not one which necessarily resembled their assailant. This argument, however, ignores the facts and we accordingly reject it. There is nothing in the record which indicates that the girls were simply trying to reach agreement or that the police were encouraging the girls to concur. The police artist did not interview the two girls at the same time, as the defendant suggests, but rather he first interviewed D.L. and constructed a representation of her attacker. Then C.N. was brought in, and it was she who suggested that the artist add more wrinkles to the subject's forehead, hardly the type of request one would expect from someone who was merely striving to agree with someone else. After adding more wrinkles, both victims independently concurred that the resulting picture accurately represented the attacker.

Moreover, how the sketch was created is essentially irrelevant since the two girls "adopted" the composite sketch as a correct representation of the attacker. In order for a police sketch to be admissible, the law requires "unequivocal testimony from the police artist that

the drawing not only was a representation prepared at the direction of the witness, but that the witness, after having had an opportunity to view the completed sketch, adopted it as an accurate portrayal of the suspect." (*People v. Yates* (1983), 98 Ill. 2d 502, 528, 456 N.E.2d 1369.) When a witness adopts a composite sketch, "the sketch is no longer the statement of the artist, but becomes, by adoption, that of the witness." (*People v. Hine* (1980), 88 Ill. App. 3d 671, 678, 410 N.E.2d 1017.) In the *Hine* case, the court determined that since the victim never made a clear and definite adoption of the sketch, it was inadmissible at trial. In this case, however, the two girls did make a clear and definite adoption of the sketch when they independently concurred that the sketch accurately represented the offender. Hence, we hold that the sketch was admissible because it was adopted by the girls and therefore became their statement.

Bullock also contends that the prosecutor's comments in closing argument referring to the "two little girls" were prejudicial to his defense in that they "inextricably intertwined" the assaults of D.L. and C.N. in such a manner that he was forced to defend himself for two rapes rather than just one. While a prosecutor is permitted wide latitude in closing argument (*People v. Belton* (1982), 105 Ill. App. 3d 10, 16, 433 N.E.2d 1119), the comments must be based on the evidence admitted at trial or on any reasonable inferences therefrom. (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 432, 426 N.E.2d 1017.) But comments by a prosecutor will not necessitate reversal unless they result in substantial prejudice to the defendant, *i.e.*, "that they were such a material factor in defendant's conviction that the jury would likely have reached a contrary verdict had they not been made." (*People v. Mitchell* (1984), 123 Ill. App. 3d 868, 876, 463 N.E.2d 864.) The court in *Mitchell* concluded that no prejudice to the defendant resulted in light of the overwhelming evidence of guilt and the trial court's reminder to the jury that they were not bound to accept the prosecutor's version of events. (*People v. Mitchell* (1984), 123 Ill. App. 3d 868, 878, 463 N.E.2d 864.) As in *Mitchell*, the trial judge herein gave clear instructions to the jury regarding the importance of closing argument and how they should consider the *modus operandi* evidence. Moreover, there is also overwhelming evidence of guilt here, particularly when one considers the fact that the pattern of the attacks was so distinctive and that each girl independently identified Bullock as the man who attacked her. Accordingly, without deciding whether the State's closing remarks were improper, we hold that in any event they do not necessitate a reversal.

Defendant's final argument concerns the withholding of alleg-

edly exculpatory evidence from the defendant. Prior to trial, Bullock had a *subpoena duces tecum* served on the Chicago police department requesting information on any rapes, attempted rapes, and batteries on females in the 4th, 5th, 6th, and 22nd police districts. The trial court granted a police department motion to quash the subpoena because of the extensive nature of the request. After trial, Bullock filed a motion for a new trial based on the contention that the State failed to disclose the information as to another rape suspect, Steven Cavanero, who had been charged with numerous sex offenses in the same area in which the D.L. and C.N. assaults had occurred. The trial court denied Bullock's post-trial motion on the ground that, in the court's opinion, Cavanero did not resemble Bullock and his *modus operandi* was entirely different.

Bullock maintains that the trial court erred in denying him a new trial regarding the allegedly exculpatory information concerning Cavanero which was withheld from him in discovery. The State presents two arguments in response: first, that the trial court properly quashed the *subpoena duces tecum* served on the Chicago police department because it was oppressive, unreasonable, and overly broad; second, that Bullock was not prejudiced by having the evidence withheld, because even if the information were disclosed it would have been inadmissible at trial in light of the fact that Cavanero's *modus operandi* and description were entirely different from that of the defendant.

We find it unnecessary to address the State's first argument, however, in light of the fact that the Cavanero evidence would have been inadmissible even if it had been disclosed, and hence Bullock could not have been prejudiced by the failure of the prosecution to release the information. "[T]he trial court may reject the evidence which the court determines to be of little probative value because of its remoteness, uncertainty or conjectural nature." (*People v. Logan* (1980), 87 Ill. App. 3d 351, 356, 408 N.E.2d 1086.) In the case at bar, the trial court held a hearing to determine if Bullock deserved a new trial based on the evidence that was withheld. The judge denied the defendant's motion for a new trial and stated that "if Steven Cavanero had a *modus operandi*, it was entirely different from that of the defendant. As far as the picture of Mr. Cavanero, looking at him and looking at the defendant, there is virtually no resemblance whatsoever." The trial judge, therefore, rejected evidence which he determined had little probative value because it did not have any peculiar and distinctive features in common with the attack upon D.L.

We affirm the trial court's ruling. The differences between the at-

tacks by Cavanero and Bullock were numerous. Cavanero did not represent himself as a police officer. He attacked older women and not children. He attacked his victims in the victim's car rather than his own car. His attacks occurred between 12 p.m. and 4 a.m., whereas Bullock's offenses occurred well into the morning. On at least one occasion Cavanero robbed his victim. Cavanero also wore a mask in all his attacks except one, whereas Bullock never wore a mask. Finally, D.L. and C.N. were shown a photograph of Cavanero, whereupon both girls stated that Cavanero was not the man who had attacked them. In light of these differences, evidence that Cavanero committed sex offenses in the same area where the D.L. attack occurred would have been inadmissible in the case *sub judice* because it lacked a "strong and persuasive *** similarity" to the offense against D.L. (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 487, 485 N.E.2d 1292.) The defendant, therefore, was not prejudiced by the fact that such evidence was withheld from him in discovery.

Affirmed.

STAMOS and BILANDIC, JJ., concur.